# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

In the Matter of the Search of: )
)
Premises located at 4790 North Hopkins Street, )
Milwaukee, WI 53209, and all closed containers, ) Case No. 17·M·1281
computers, mobile devices, or electronic storage media )
found therein, more particularly described in Attachment )
A-2. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Premises located at 4790 North Hopkins Street, Milwaukee, WI 53209, and all closed containers, computers, mobile devices, or electronic storage media found therein, more particularly described in Attachment A-2.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
21 U.S.C. §§ 813, 841 and 846, conspiracy to distribute and possess with the intent to distribute controlled substances and controlled substance analogues; Title 21 U.S.C. §§ 331(a) and 333(a)(2), introducing into interstate commerce misbranded drugs; and 18 U.S.C. §§ 1956 and 1957, money laundering.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew McCarthy, DEA Special Agent
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 5/22/17 _____

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANT

MATTHEW MCCARTHY, Special Agent, Drug Enforcement Administration being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1.      I am a Special Agent with the Drug Enforcement Administration ("Investigating Agency"). As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been personally involved in numerous investigations involving the distribution of controlled substances. I have been a Special Agent with the Drug Enforcement Administration for approximately 14 years.  From these experiences, I have become familiar with the ways in which these schemes are conducted.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the "lingo" and coded language used by narcotics traffickers.  I have also participated in the execution of search warrants involving evidence of drug trafficking activity

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the premises specified below (the "SUBJECT PREMISES") for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI").  Because this affidavit is being submitted for the limited purpose of establishing probable

1

cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Premises**

3.      The SUBJECT PREMISES-1 is located at 6870A South 10th Street, Oak Creek, WI 53154, which is a commercial warehouse with a tan exterior located near the intersection of South 10th Street and South Southfield Boulevard, and all closed containers therein, as well as any computers, mobile devices, or electronic storage media found therein.  The SUBJECT PREMISES-1 is located in the northeast corner of the Miltec building at 6870 South 10th Street, Oak Creek, WI 53154.  The entrance to the SUBJECT PREMISES-1 is an off-white metal and glass door that faces to the north.  A white garage door is directly to the right of the entrance.  The SUBJECT PREMISES-1 is described with more particularity in Attachment A-1.

4.      The SUBJECT PREMISES-2 is 4790 North Hopkins Street, Milwaukee, WI 53209, which is a convenient store with a brick and concrete exterior located on the corner of North Hopkins Street and West Hampton Avenue, and all closed containers therein, as well as any computers, mobile devices, or electronic storage media found therein.  The SUBJECT PREMISES-2 contains a sign above the entrance that states "FOODTOWN MINI-MART."  The entrance to the SUBJECT PREMISES-2 is a glass and metal door.  The SUBJECT PREMISES-2 is described with more particularity in Attachment A-2.

**C. The Subject Offenses**

5.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises contains evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 813, 841 and 846 (conspiracy to distribute and possess with the intent to distribute controlled substances and controlled substance analogues); Title 21, United States

Code, Sections 331(a) and 333(a)(2) (introducing into interstate commerce misbranded drugs); and Title 18, United States Code, Sections 1956 and 1957 (money laundering) (the "Subject Offenses").

## II. Probable Cause

### A. Background to the Investigation

6.       Since in or about June 2016, I and other DEA agents have been investigating a drug trafficking organization ("DTO") involved in the manufacture, distribution, and use of synthetic cannabinoids in the Southern District of New York and elsewhere. Synthetic cannabinoids are a class of designer drugs that contain, among other things, various substances that are classified as Schedule I Controlled Substances or Controlled Substance Analogues under the Analogue Controlled Substances Act, Title 21, United States Code, Section 813. "K2" and "Spice" are common examples of synthetic cannabinoids. One common way in which "K2" and "Spice" are created is when damiana or marshmallow leaves, each an inert, plant-like substance, are sprayed with synthetic cannabinoids and treated with synthetic flavoring. The flavored, treated leaves are then packaged into foil pouches before being smoked by users. The DEA has identified HIKMAT HAMED, MOHAMMED ABDELELAH AL BARBARAWI, NEHAD THAHER, SHADI SHUAIBI, HATEM K. EL HAJ, SALEH KADHIN AL SUDANI, HAMZA ABURUB, and others known and unknown as participants in the DTO. On or about May 17, 2017, a grand jury sitting in the Southern District of New York returned an indictment charging HIKMAT HAMED, MOHAMMED ABDELELAH AL BARBARAWI, NEHAD THAHER, SHADI SHUAIBI, HATEM K. EL HAJ, and MAYTHEM AL ABOUDI with (1) conspiracy to distribute and possess with the intent to distribute controlled substance analogues; and (2) conspiracy to introduce into interstate commerce misbranded drugs. The DEA has also identified a number of

locations where the DTO appears to store and/or manufacture raw materials and finished product, including the SUBJECT PREMISES-1 and the SUBJECT PREMISES-2.

7.     Based on my participation in this investigation—including my review of products that were sold by the DTO, sent by the DTO, or seized from the DTO—I believe that this DTO deliberately misbrands the synthetic cannabinoids that it introduces into interstate commerce and sells to customers. The DTO deliberately misbrands its drugs in order to, among other things, reduce the odds of detection by law enforcement. Specifically, the labeling on the packets of synthetic cannabinoids is misleading in several ways, including (1) the labeling does not accurately describe the package's contents or ingredients; (2) the labeling frequently claims that the packages are in compliance with federal law, which they are not; and (3) the labeling commonly states that the product is not intended for human consumption, which is contradicted by DTO members' conversations and actions.

**B.   The Cooperating Witness**

8.     As part of this investigation, the DEA has also been working with a cooperating witness since in or around June 2016 who has (1) provided information about previous sales of synthetic chemicals to HIKMAT HAMED, including bank accounts used by the DTO to launder the proceeds of sales of synthetic cannabinoids and to purchase raw materials for manufacturing synthetic cannabinoids; (2) made a controlled sale to HIKMAT HAMED of 85,000 small foil pouches used to package synthetic cannabinoids, which was shipped to SALEH KADHIN AL SUDANI at a storage facility in West Virginia at HIKMAT HAMED's request on or about August 30, 2016; (3) arranged a controlled shipment of approximately four ounces of synthetic cannabinoids from HIKMAT HAMED, which was shipped from Kentucky by AL SUDANI to an address in Manhattan on or about October 5, 2016; (4) engaged in recorded phone conversations with HIKMAT HAMED discussing these transactions on HIKMAT HAMED's cellphones and the

SureSpot mobile messaging application ("SureSpot"), as well as HIKMAT HAMED's concern about law enforcement detection; (5) met with HIKMAT HAMED on or about December 1, 2016 at HIKMAT HAMED's warehouse located at 4601 Riverview Boulevard, St. Louis, MO to discuss the DTO's operations; (6) received from HIKMAT HAMED tracking numbers for shipments of suspected synthetic chemicals, which allowed for law enforcement, with the assistance of geolocation data for the AL SUDANI Cellphone, to conduct surveillance and observe AL SUDANI pick up packages and drive them to Louisville, Kentucky on or about November 3, 2016, and seize packages from John F. Kennedy Airport and a post office in West Virginia on or about December 16, 2016; (7) conduct a controlled delivery of damiana and marshmallow leaves to the DTO on or about December 29, 2016 at SUBJECT PREMISES-1; and (8) arranged with HIKMAT HAMED for a controlled delivery of a 3 kilogram parcel of synthetic chemicals that was shipped to Manhattan, the contents of which tested positive for synthetic chemicals.

## C. Wiretap Investigation/Seizures

9.     Based in part on the evidence described above, law enforcement has applied for and obtained authorization to intercept wire communications over cellphones used by HIKMAT HAMED, AL BARBARAWI, THAHER, and SHUAIBI among others. Among other things, the intercepted communications have included discussions regarding the manufacturing, distribution, and sale of synthetic cannabinoids, including conversations with the Target Subjects. With the assistance of, among other things, the intercepted communications and geolocation information, the DEA has also been able to: (1) conduct surveillance of a meeting in Bridgeview, Illinois on or about January 3, 2017 between Target Subjects AL BARBARAWI, HATEM K. EL HAJ, a/k/a "Tug Tug," and IBRAHIM HASSAN ABD EL AZIZ, a/k/a "Zada Ibrahium Hassan," a/k/a "Bach" where a package was exchanged; (2) conduct a traffic stop of ABD EL AZIZ's vehicle after the meeting to ask for ABD EL AZIZ's driver's license and conduct a consent search of the vehicle,

which revealed a bag containing approximately one kilogram of a white powdery substance believed to be synthetic chemicals used to manufacture synthetic cannabinoids; (3) conduct a traffic stop of Target Subject HAMZA ABURUB, and FNU LNU, a/k/a "Vanessa Issa Laith," on or about January 13, 2017 while they were driving from West Virginia to Kentucky, which led to the recovery of a package believed to contain synthetic chemicals; (4) seize two packages in Louisville, Kentucky after NEHAD THAHER received text messages with the tracking numbers, the contents of which tested positive for synthetic chemicals; and (5) seize trash bags containing approximately 40 kilograms of packets containing synthetic cannabinoids from SHUAIBI and MOHAMMAD ANWAR, a/k/a "Baazi," which tested positive for synthetic chemicals.

### D. Probable Cause Relating to the Subject Premises

SUBJECT PREMISES-1 - The "Oak Creek Warehouse"

10.      Based on my involvement in the investigation, I know that the following surveillance has been conducted near the SUBECT PREMISES-1, which correspond with intercepted phone conversations discussing the manufacturing and distribution of synthetic cannabinoids.  For example:

a.   On or about January 24, 2017, at approximately 9:53 a.m. EST, AL BARBARAWI, using a cellular telephone initially identified as 708-735-4518 (the "AL BARBARAWI 4518 Cellphone"), placed an outgoing call to FNU LNU, a/k/a "Ali," using a cellular telephone initially identified as 414-629-4902 (the "FNU LNU 4902 Cellphone).   The following conversation occurred in Arabic, in substance and in part, and I have reviewed a draft translation of the conversation:

. . .

**AL BARBARAWI:**         What are the news?

| | |
|---|---|
| **ALI:** | By God, nothing |
| **AL BARBARAWI:** | It seems you're not excited that we are receiving merchandise? Did you change your mind? [laughing] |
| **ALI:** | Now you're awake, by God, you're better when you're asleep [laughing] |
| **AL BARBARAWI:** | [giggling] That means you don't want merchandise? |
| **ALI:** | [Sighs] No, why do I not want? There is no difference, boss |
| **AL BARBARAWI:** | Shall I send them back? |
| **ALI:** | [laughing] What transpired? Anything took place now and for sure? |
| **AL BARBARAWI:** | Yes, man . . . He is bringing five kilos and after he does, we bring the LEAF and then yes we start working |
| **ALI:** | You want to start doing it tonight? |
| **AL BARBARAWI:** | Ya |
| **ALI:** | What do you want me to bring with me? The mixer, you want me to bring the plastic? What you want me to do? |
| **AL BARBARAWI:** | The mixer, the mixer and plastic |
| **ALI:** | Ha? |
| **AL BARBARAWI:** | The mixer, the mixer and plastic |
| **ALI:** | So, the mixer and plastic . . . Any plastic, ha? |
| **AL BARBARAWI:** | Yes, any plastic [voices overlap] Not necessarily |
| **ALI:** | Ok . . . |
| **AL BARBARAWI:** | [yawning] [unintelligible] |
| **ALI:** | After we receive them, we will work |
| | . . . |

| | |
|---|---|
| **AL BARBARAWI:** | Ok . . . Let me go [hesitates] and secure three to four thousand dollars . . . We will meet at 10 at the same time and in the same place |

      . . .

Based on my training, experience, and participation in this investigation, including my review of prior and subsequent intercepts, it appears that AL BARBARAWI and FNU LNU, a/k/a "Ali," are discussing an incoming shipment of "merchandise," which is a term frequently used by the DTO to refer to synthetic chemicals. AL BARBARAWI further specifies that "He is bringing five kilos and after he does, we bring the LEAF and then yes we start working," which suggests that an individual is bringing five kilograms of synthetic chemicals. Once they arrive, AL BARBARAWI will bring "LEAF," which is a term used to describe the damiana and marshmallow leaves used to manufacture synthetic cannabinoids. Additionally, FNU LNU, a/k/a "Ali" offers to bring a "mixer" and "plastic," which are tools used to manufacture synthetic cannabinoids. Based on my training and experience, I know that mixers are used to mix the powder synthetic chemicals with acetone-based liquids in order to create a liquid that can be sprayed onto damiana and marshmallow leaves. Additionally, once the leaves are sprayed with chemicals, they are frequently left to dry on large plastic tarps. As a result, it appears that FNU LNU, a/k/a "Ali," and AL BARBARAWI are planning to get together "at 10 at the same time and in the same place" to begin manufacturing synthetic cannabinoids. Later that day, at approximately 8:06 p.m. EST, AL BARBARAWI, using the AL BARBARAWI 4518 Cellphone, made an outgoing call to FNU LNU, a/k/a "Ali," using the FNU LNU 4902 Cellphone. The following conversation occurred in Arabic, in substance and in part, and I have reviewed a draft translation of the conversation. During this conversation, AL BARBARAWI stated: "That's all man, I'm coming . . . around 10, we fix everything and we will put it in the water, do you follow? Make sure he is coming." Later that

day, at approximately 10:38 p.m. EST, AL BARBARAWI, using the AL BARBARAWI 4518 Cellphone, received an incoming call from FNU LNU, a/k/a "Ali,", using the FNU LNU 4902 Cellphone. The following conversation occurred in Arabic, in substance and in part, and I have reviewed a draft translation of the conversation. During this conversation, AL BARBARAWI stated: "Pay attention pal, we will finish the project for you, God's willing." FNU LNU, a/k/a "Ali" responded: "Because I want to go half an hour before you to assemble the mixer." Based on my training, experience, and participation in this investigation, it appears that AL BARBARAWI and FNU LNU, a/k/a "Ali" were coordinating a meeting in order to drop off tools and raw materials for manufacturing synthetic cannabinoids. Based on geolocation information relating to the AL BARBARAWI 4518 Cellphone and the FNU LNU 4902 Cellphone, I know that at approximately 11:09 p.m. EST, the FNU LNU 4902 Cellphone was in the vicinity of the SUBJECT PREMISES-1. Similarly, law enforcement surveillance observed a vehicle ("the FNU LNU Vehicle") at 11:10 p.m. EST drive toward the SUBJECT PREMISES-1. Additionally, based on geolocation information, it appears that the AL BARBARAWI 4518 Cellphone and the FNU LNU 4902 Cellphone were at a nearby Starbuck's Coffee Shop at approximately 12:23 a.m. EST. Approximately 10 minutes later, law enforcement observed the FNU LNU vehicle and a second vehicle drive toward the SUBJECT PREMISES-1. Based on my review of law enforcement databases, I know that the FNU LNU Vehicle is registered to an address in the Milwaukee area where the FNU LNU Cellphone frequently appears to be located overnight. As a result, it appears that FNU LNU, a/k/a "Ali," is the user of the FNU LNU Vehicle.

      b.   On or about March 2, 2017, at approximately 9:13 p.m. EST, law enforcement conducting surveillance at the SUBJECT PREMISES-1 observed the FNU LNU Vehicle arrive at the SUBJECT PREMISES-1. Geolocation information for the AL BARBARAWI 4518 Cellphone

also indicated that the AL BARBARAWI 4518 Cellphone was at the SUBJECT PREMISES-1. At approximately 9:40 p.m., law enforcement observed lights turning on through opaque windows and individuals walking inside the SUBJECT PREMISES-1. At approximately 9:55 p.m. EST, law enforcement observed the FNU LNU Vehicle depart the SUBJECT PREMISES-1 and drive to a gas station where another vehicle (the "AL BARBARAWI Vehicle") was parked, which was registered to an address previously identified in law enforcement databases as being AL BARBARAWI's last known home address. Approximately ten minutes later, law enforcement observed AL BARBARAWI exit the FNU LNU Vehicle and enter the AL BARBARAWI Vehicle.

      c. On or about March 20, 2017, at approximately 10:34 p.m. EST, law enforcement observed the FNU LNU Vehicle and the AL BARBARAWI Vehicle arrive at a coffee shop nearby the SUBJECT PREMISES-1. Geolocation information for the AL BARBARAWI 4518 Cellphone similarly located that the AL BARBARAWI 4518 Cellphone was nearby the gas station. At approximately 10:49 p.m. EST, law enforcement observed a pick-up truck registered to a rental car company (the "Rental Pick-Up Truck") arrived to the coffee shop. Law enforcement observed that the bed of the Rental Pick-Up Truck contained something covered by a blue tarp. Several minutes later, AL BARBARAWI entered the FNU LNU Vehicle, and the FNU LNU Vehicle and the Rental Pick-Up Truck proceeded to the SUBJECT PREMISES-1. After arriving at the SUBJECT PREMISES-1, law enforcement observed individuals remove blue tarps, large items, boxes, and bags from the Rental Pick-Up and take them into the SUBJECT PREMISES. Information relating to the Rental Pick-Up Truck showed that it had been rented in Louisville, Kentucky, which is a location where NEHAD THAHER, SHADI SHUAIBI, and others in the DTO reside and operate.

d.  On or about March 20, 2017, at approximately 10:45 p.m. EST, THAHER, using the THAHER 8213 Cellphone, made an outgoing call to AL BARBARAWI, using the AL BARBARAWI 7034 Cellphone.  The following conversation occurred in Arabic, in substance and in part, and I have reviewed a draft translation of the conversation.  THAHER asked AL BARBARAWI: "Ha ABU YAZAN?  Did they arrive and you have received?"  AL BARBARAWI responded: "No, man . . . No, not yet, they still need about 10 minutes."  THAHER responded: "10 . . . in other words, you talked to them?"  AL BARBARAWI responded: "Yes, NEHAD."  Based on my training, experience, and involvement in this investigation, including my review of prior and subsequent intercepts, it appears that FNU LNU, a/k/a "Ali" and AL BARBARAWI were waiting at a coffee shop by the SUBJECT PREMISES-1 for THAHER's associates who were bringing raw materials for manufacturing synthetic cannabinoids at the SUBJECT PREMISES-1. This phone call corresponds with the fact that the Rental Pick-Up Truck did not arrive until approximately five minutes after this phone call.  On or about March 21, 2017, at approximately 12:13 a.m. EST, THAHER, using the THAHER 8213 Cellphone, made an outgoing call to SHADI SHUAIBI, using the SHUAIBI 0809 Cellphone.  The following conversation occurred in Arabic, in substance and in part, and I have reviewed a draft translation of the conversation.  THAHER asked SHUAIBI: "Ah . . . Did they arrive?"  SHUAIBI responded: "They did, man . . . Long time ago."  THAHER then stated: "They arrived and delivered it, ha?"  SHUAIBI later responded: "They followed him to the warehouse."  Based on my training, experience, and involvement in this investigation, including my review of prior and subsequent intercepts, it appears that SHUAIBI is confirming to THAHER that the individuals in the Rental Pick-Up dropped off raw materials to AL BARBARAWI and FNU LNU, a/k/a "Ali," at the SUBJECT PREMISES-1. Several minutes later, at approximately 12:30 a.m. EST, THAHER, using the THAHER 8213

Cellphone received an incoming call from AL BARBARAWI, using the AL BARBARAWI 7034 Cellphone. The following conversation occurred in Arabic, in substance and in part, and I have reviewed a draft translation of the conversation. THAHER asked AL BARBARAWI: "Did you get it?" AL BARBARAWI responded: "Yes." THAHER then stated: "O God, thanks be to God . . . Didn't its smell dizzy you?" AL BARBARAWI responded: "God damn its smell." THAHER then stated: "Its smell is repulsive." AL BARBARAWI also stated: "Because my chest pain, I took off the thing and ate shit." THAHER responded: "What did you take off?" AL BARBARAWI responded: "The mask." Based on my training, experience, and participation in this investigation, including my review of prior and subsequent intercepts, it appears that AL BARBARAWI received from THAHER and SHUAIBI's associates a shipment of synthetic chemicals. AL BARBARAWI was then at the SUBJECT PREMISES-1 processing the chemicals in preparation for spraying the chemicals onto damiana and marshmallow leaves and was commenting on the strong smell. AL BARBARAWI also noted that he "took off the thing and ate shit" and later clarified that he took off the "mask." Based on my training and experience, I know that individuals who manufacture synthetic cannabinoids frequently have to wear masks for danger that they may overdose from inhaling the fumes of the synthetic chemicals. Based on my review of geolocation information relating to the AL BARBARAWI 7034 Cellphone, it appears that the AL BARBARAWI 7034 Cellphone was located at the SUBJECT PREMISES-1 at the time of this phone call.

   e.   On or about May 3, 2017, at approximately 9:00 p.m. EST, law enforcement observed the FNU LNU Vehicle arrive at a gas station near the SUBJECT PREMISES-1. Several minutes later, law enforcement also observed that the AL BARBARAWI Vehicle was also at the gas station and observed the FNU LNU Vehicle depart and drive towards the SUBJECT

PREMISES-1. After arriving at the SUBJECT PREMISES-1, law enforcement observed two individuals remove items from the FNU LNU Vehicle and bring them inside the SUBJECT PREMISES-1. At approximately 9:55 p.m. EST, the FNU LNU Vehicle left the SUBJECT PREMISES-1.

SUBJECT PREMISES-2 - The "Store"

11.    Based on my involvement in this investigation, my review of law enforcement reports, and my conversations with other law enforcement officers, I know that the following controlled buys of synthetic cannabinoids have been conducted at the SUBJECT PREMISES-2:

a.    On or about June 3, 2016, an undercover law enforcement agent ("UC-1") entered the SUBJECT PREMISES-2 and asked a store clerk for two packages of "Scooby," which is a known brand of synthetic cannabinoids. The store clerk then reached behind the counter and showed UC-1 approximately four packages of synthetic cannabinoids and asked UC-1 to pick the two he wanted. UC-1 selected two packets of synthetic cannabinoids labeled "Joker" and "OMG" and handed $30 of currency to the store clerk. The packets of synthetic cannabinoids later tested positive for the presence of controlled substance analogues.

b.    On or about June 22, 2016, UC-1 entered the SUBJECT PREMISES-2 and observed a list of known brands of synthetic cannabinoids listed on a piece of paper on a counter in the SUBJECT PREMISES-2. UC-1 told a store clerk that he wanted the "Psycho 5 grams," "Scooby Snax strawberry," and a "one-hitter" style pipe commonly used to smoke controlled substances. The clerk provided the packets of synthetic cannabinoids to UC-1, and UC-1 gave the store clerk approximately $46.22 of currency. The packets of synthetic cannabinoids later tested positive for the presence of controlled substance analogues.

c. On or about November 18, 2016, UC-1 entered the SUBJECT PREMISES-2 and asked a store clerk for approximately four bags of synthetic cannabinoids. UC-1 observed a glass display case on the counter that contained glass pipes commonly used to smoke controlled substances. The store clerk provided to UC-1 two bags of "Scooby Snax," one bag of "WTF," and one bag of "Caution," as well as a glass pipe. UC-1 then handed the store clerk approximately $60 in currency. The packets of synthetic cannabinoids later tested positive for the presence of controlled substance analogues.

d. On or about January 24, 2017, UC-1 entered the SUBJECT PREMISES-2 and asked the store clerk for approximately $200 worth of synthetic cannabinoids. The store clerk then walked into a side room of the store. Several minutes later, the store clerk reemerged carrying a dark-colored plastic bag with multiple bags of synthetic cannabinoids, which was provided to UC-1. The synthetic cannabinoids later tested positive for the presence of controlled substances and controlled substance analogues.

e. On or about March 8, 2017, UC-1 entered the SUBJECT PREMISES-2 and asked the store clerk for approximately $450 worth of synthetic cannabinoids. The store clerk stated that he could provide up to $5000 worth of synthetic cannabinoids at a time. Several minutes later, the store clerk gave UC-1 a dark-colored plastic bag containing approximately 18 packets of synthetic cannabinoids.

12. Based on my involvement in this investigation, I know that on or about March 21, 2017, March 24, 2017, law enforcement observed the FNU LNU Vehicle parked nearby the SUBJECT PREMISES-2.

13. On or about May 15, 2017, UC-1 entered the SUBJECT PREMISES-2 and asked the store clerk for approximately $5,000 worth of synthetic cannabinoids. The store clerk

responded that he would provide approximately 200 "big bags" of synthetic cannabinoids. Approximately 20 minutes later, the store clerk provided UC-1 with a box containing approximately 2 kilograms of synthetic cannabinoids suspected to contain controlled substances or controlled substance analogues. The store clerk also provided a phone number to UC-1 so that UC-1 could call ahead the next time when placing a large order.

14. Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence, fruits, or contraband relating to the Subject Offenses will be located at the Subject Premises. Further, based on my training, experience, participation in other narcotics investigations, and discussions with other law enforcement officers experienced in narcotics investigations, I know that drug traffickers commonly use a residence to serve as a base of operation for their narcotics trafficking organization. Specifically, drug traffickers often use a residence to break down kilogram-quantities of narcotics into packages of street-level quantities of narcotics for further distribution. As a result, the following items, among other things, which are frequently stored by narcotics traffickers in the course of their narcotics trafficking activities and which constitute evidence of narcotics trafficking, are likely to be found in the residences of individuals who are engaged in narcotics trafficking:

    a. Individuals who engage in narcotics trafficking often place utilities, registrations, and other assets in names other than their own to avoid detection by law enforcement and other government agencies.

    b. It is common for narcotics traffickers to store narcotics, narcotics proceeds, and records relating to the trafficking of narcotics at their residences and or businesses.

    c. Narcotics traffickers often maintain on hand, at their home and/or residence, large amounts of U.S. currency in order to maintain and finance their narcotics trafficking.

d.      Individuals who engage in narcotics trafficking often maintain books, records, receipts, notes, ledgers, and other papers relating to the procurement, distribution, storage, and transportation of controlled substances.  These records can include the telephone numbers of customers and sources and the amount of controlled substances distributed to various customers, along with running totals of debts owed by those customers.  Such individuals also maintain paraphernalia utilized to cut and package controlled substances, commonly maintained in locations to which narcotic traffickers have frequent and ready access, *i.e.*, homes, business, and automobiles.  Based on my training and experience I know that it is common for drug traffickers to maintain these records for significant periods of time, to include several years, for the purpose of knowing what debts are owed to them or what debts they may owe.

e.      It is common for narcotics traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within the location they sell narcotics for ready access and to conceal them from law enforcement authorities.

f.      Individuals who engage in narcotics trafficking often maintain contact information of their criminal associates or co-conspirators, to include names, addresses, telephone numbers, social media account identifiers, or email addresses, in books, papers, or electronic records, and often store such information in electronic devices including but not limited to cellular telephones.

g.      During or in relation to drug transactions, individuals who engage in narcotics trafficking often take or cause to be taken photographs of themselves, their associates, their property and their product, and often maintain such photographs at their residences and/or other properties that they control.

h. Drug traffickers often use electronic equipment to aid them in their illegal activities, including but not limited to cellular telephones, digital display pagers, speed dialers, electronic telephone books, electronic date books, money counters, electronic surveillance equipment, eavesdropping equipment, police radio scanners, and portable communication devices.

i. Individuals who engage in narcotics trafficking often utilize electronic devices to assist in the maintenance of their ongoing drug business in the form of "electronic records." These records can include but are not limited to cellular phones, computers, flash drives, memory cards, computer gaming systems, currency counting machines, telephone answering machines, video equipment, and audio recording devices.

j. It is common for drug traffickers to communicate through social media accounts, such as Facebook, Instagram, Twitter, SnapChat, and others, in an attempt to conceal from law enforcement communications that may implicate them in criminal activity.

k. Based on my experience in narcotics investigations, I know that individuals who traffic in controlled substances frequently maintain firearms to protect both the controlled substances and the proceeds derived from their sale, from other narcotics traffickers and from law enforcement authorities. This is especially true where, as here, the narcotics traffickers are facing threats of violence from other individuals, including their suppliers.

l. Based on my training, experience participation in other investigations concerning narcotics trafficking, and extensive discussions with other law enforcement agents, I know that individuals who engage in narcotics trafficking frequently travel commercially both domestically and internationally to receive or distribute drugs or drug proceeds. This is especially true where, as here, it appears that the case potentially involves a source of drugs in Hong Kong, and the drugs are ultimately distributed in the New York Metropolitan area. As a result, I know

that individuals traveling for the purposes of engaging in narcotics trafficking frequently maintain papers, tickets, notes, receipts, and other items relating to domestic and international travel.

m.     Based on my training, experience, participation in other investigations concerning narcotics trafficking, and extensive discussions with other law enforcement agents, I know that individuals who traffic narcotics routinely secrete and store books, records, documents, currency and other items of the sort described in the preceding paragraph and in Attachment B, which is incorporated herein by reference, in secure locations like cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items. I therefore seek authorization to open any closed items and containers or to seize any such closed items and containers so that they may be opened if tools or other implements are required.

## III.  Specifics of Search and Seizure of Electronic Storage Media

### A. Execution of Warrant for ESI

15.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices, cellular phones, and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software and cellular phone operating systems in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer or cellular phone, which often take considerable time and resources for forensic personnel to detect and resolve.

**B. Review of ESI**

16.     Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

17.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[1]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

18. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

### C. Return of ESI

19. If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

### IV. Conclusion and Ancillary Provisions

20. Based on the foregoing, I respectfully request the court to issue warrants to search the Subject Premises, specified in Attachment A to this affidavit and to the Search and Seizure

---

[1] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

Warrant, and seize the items and information specified in Attachment B to this affidavit and to the Search and Seizure Warrant.

21.    Based on my involvement in this investigation, I know that the DEA is in the process of obtaining search warrants in other jurisdictions, including jurisdictions that are in the Eastern Standard time zone (EST). For the safety of the officers and to prevent the destruction of evidence, the DEA plans to execute these search warrants simultaneously at approximately 6 a.m. EST. As a result, I request permission to execute the requested warrants between 6.am. and 10 p.m. EST.

22.    In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

23.    WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41, I request that the Court issue a search warrant to search the Subject Premises described in Attachment A and seize those items set forth in Attachment B.

24.    No previous request has been made as to the Subject Premises.

## Attachment A-1 – SUBJECT PREMISES-1

The premises to be searched ("SUBJECT PREMISES-1") is described as follows, and include all locked and closed containers and spaces found therein:

The SUBJECT PREMISES-1 is 6870A South 10th Street, Oak Creek, WI 53154, which is a commercial warehouse with a tan exterior located near the intersection of South 10th Street and South Southfield Boulevard, and all closed containers therein. The SUBJECT PREMISES-1 is located in the northeast corner of the Miltec building at 6870 South 10th Street, Oak Creek, WI 53154. The entrance to the SUBJECT PREMISES-1 is an off-white metal and glass door that faces to the north. A white garage door is directly to the right of the entrance.





1

## Attachment A-2 – SUBJECT PREMISES-2

The premises to be searched ("SUBJECT PREMISES-2") is described as follows, and include all locked and closed containers and spaces found therein:

The SUBJECT PREMISES-2 is 4790 North Hopkins Street, Milwaukee, WI 53209, which is a convenient store with a brick and concrete exterior located on the corner of North Hopkins Street and West Hampton Avenue, and all closed containers therein. The SUBJECT PREMISES-2 contains a sign above the entrance that states "FOODTOWN MINI-MART." The entrance to the SUBJECT PREMISES-2 is a glass and metal door.



**ATTACHMENT B**
**Search and Seizure Authorization**

This Warrant authorizes law enforcement to enter the SUBJECT PREMISES, including, where necessary, by means of trespass over private property, and any closed or locked areas and closed or locked containers found therein, and to search for and seize instrumentalities, evidence, and fruits of violations of Title 21, United States Code, Sections 813, 841 and 846 (conspiracy to distribute and possess with the intent to distribute controlled substances and controlled substance analogues); Title 21, United States Code, Sections 331(a) and 333(a)(2) (introducing into interstate commerce misbranded drugs); and Title 18, United States Code, Sections 1956 and 1957 (money laundering), specifically:

**A. Evidence, Fruits, and Instrumentalities of the Subject Offenses**

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 813, 841 and 846 (conspiracy to distribute and possess with the intent to distribute controlled substances and controlled substance analogues); Title 21, United States Code, Sections 331(a) and 333(a)(2) (introducing into interstate commerce misbranded drugs); and Title 18, United States Code, Sections 1956 and 1957 (money laundering) (the "Subject Offenses"):

1. Narcotics and controlled substances and all evidence of narcotics and controlled substances use, transportation, possession or distribution including records, papers, ledgers, tally sheets, digital display pagers, digital beepers, speed dialers, stored electronic communication devices, mobile telephones, electronic telephone and date books.

2. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

3. Papers, tickets, notes, receipts, and other items relating to domestic and international travel.

4. Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, payment receipts, mortgage receipts, mortgage payments, deeds,

1

passbooks, money orders, cashier's checks, bank checks, safe deposit box keys, money wrappers, filed and non-filed income tax records, credit card receipts, credit card statements, minute books and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

5.    Proceeds of drug trafficking, including United States currency, precious metals, jewelry, and financial instruments, including certificates of deposit and stocks and bonds.

6.    Photographs, including still photos, slides, negatives, digital images, video tapes, films, undeveloped film and the contents therein, in particular photographs of associates, possible co-conspirators, assets, and/or controlled substances.

7.    Address and/or telephone books, rolodex indices, and any pagers or cell phones that have the ability to store names, addresses, telephone numbers, pager numbers, fax numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a drug trafficking relationship exists.

8.    Firearms and ammunition, including but not limited to, handguns, pistols, revolvers, and other weapons, as well as, any records or receipts pertaining to firearms and ammunition.

9.    Computers, hard disks, floppy disks, jump drives, thumb drives, magnetic tape, PDA, cellular phones, or any other computer storage facility that has the capacity to store documents or records (or copies thereof) identified in Paragraph Nos. 1 through 7.

10.    Indicia of occupancy, residency, rental, and/or ownership of the premises to be searched, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys.

11.    Documents and articles of personal property relating to the identity of the persons occupying, possessing, residing in, owning, frequenting or controlling the Subject Premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, answering machine tape recordings, cellular telephones, rolodexes, telephone answering pads, storage records, vehicle records, cancelled mail envelopes, correspondence, bank records, safety deposit box records, cancelled checks, and other records of income and expenditure, credit card and bank records, travel documents, and personal identification documents.

**B.  Search and Seizure of Electronically Stored Information**

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section A of this Attachment above, including, but not limited to, desktop and laptop

computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital

cameras, and scanners. In lieu of seizing any such computer devices or storage media, this warrant

also authorizes the copying of such devices or media for later review.

The items to be seized from the Subject Premises also include:

1.      Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.      Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.      Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.   Review of ESI

Following seizure of any computer devices and storage media and/or the creation of

forensic image copies, law enforcement personnel (which may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, agency

personnel assisting the government in this investigation, and outside technical experts under

government control) are authorized to review the ESI contained therein for information responsive

to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate

information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

3

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections A and B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

4